Howard ALLEN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9207–DP–566.

Supreme Court of Indiana.

Sept. 25, 1997.

Brent Westerfeld, Indianapolis, for Appellant.

Jeffrey Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

Howard Allen appeals his conviction and sentence of death for the robbery, Ind.Code § 35–42–5–1, murder, Ind.Code § 35–42–1– 1(1) and felony murder, Ind.Code § 35–42–1– 1(2), of Ernestine Griffin, a woman of seventy-four. We affirm Allen's conviction and sentence on each count.

Allen alleges seventeen errors. These may be characterized as raising eleven legal issues:

(1) That his privilege against self-incrimination was violated by

 (a) inadequate *Miranda* warnings;

 (b) improper custodial interrogation; and

 (c) failure to respect Allen's invocation of his constitutional rights;

(2) That Allen was denied due process because the jury was allowed to hear allegedly perjured testimony;

(3) That hearsay statements uttered by the victim were improperly admitted at trial;

(4) That Allen was denied due process when the jury was allowed to view autopsy pictures;

(5) That Allen was denied due process when the trial court refused to give instructions

 (a) on theft as a lesser included offense; and

 (b) adequately guiding the jury at sentencing;

(6) That the trial court's failure to order *sua sponte* a competency examination denied Allen due process;

(7) That he was denied effective assistance of counsel in both the guilt and penalty phases of his trial, at his sentencing hearing, and in the appellate process;

(8) That Allen's right of confrontation was violated by the trial judge's communication with the jury out of his presence during the sentencing phase;

(9) That he was denied a speedy appeal;

(10) That Allen is mentally retarded and cannot be sentenced to death therefor; and

(11) That Allen's death sentence is unconstitutional because it is based on

 (a) improper victim-impact evidence; and

 (b) non-statutory aggravators.

We approach these claims as follows. Part I of this opinion lays out the facts in two sections. Section (A) recounts the evidence and investigation, and Section (B) details procedural history. Part II addresses Allen's allegations of guilt-phase error, which are the first six issues listed. Allen's sweeping claim of ineffective assistance of counsel stands alone in Part III because it concerns all stages of these proceedings. Part IV then addresses sentencing and post-trial procedural issues.

## I. Facts

### A. The Crimes and Investigation

Ernestine Griffin lived alone on the northside of Indianapolis. During a robbery on July 14, 1987, she was killed in her home through a combination of blunt trauma to her head and a knife wound to her chest. Property taken during the robbery consisted of her wallet and its contents, a camera and case, and a battery charger for the camera.

The chain of events leading to Griffin's murder began the preceding day. That morning, Griffin entertained the questions of a man who stated he was interested in purchasing a car. The car that interested him belonged to Dr. Victor Seaman, whose dental office was located next door. Griffin and Dr. Seaman had been neighbors for years and were close friends.

Griffin could not answer the man's questions about the car, but she advised him that she would forward his name and telephone number to her neighbor. The man wrote his name and home telephone number on a check stub and left it with Griffin. That note contained the words, "Howard Allen/ 545–4109." Some time later that day, Griffin telephoned Dr. Seaman at his home and recorded the potential buyer's name and number on Dr. Seaman's answering machine. When listening to Griffin's message, Dr. Seaman wrote a note to himself containing the information, "545–4109/ after 6/ Howard Allen."

That evening, Dr. Seaman tried to call Allen, but was unable to reach him. Instead, Dr. Seaman spoke with a woman who identified herself as Allen's sister, April Allen. He gave her a message that included his name and home phone number. April Allen wrote the message on a pack of rolling papers, but ultimately failed to deliver the message to Howard. Police later obtained the message during a warranted search of the Allen residence.

At about 10:25 a.m. the next morning, July 14, the would-be car buyer returned to Ms. Griffin's home. Dr. Seaman was not in his office, so Griffin telephoned him at home. She told him that "the same black man" returned. She put the man on the line, and the two men talked briefly. (R. at 2112–14.) Dr. Seaman was too busy to carry on a lengthy dialogue because he was preparing to leave for a personal appointment. He asked the would-be buyer if he worked, and the man told him that he worked at Bluko Car Wash. A few minutes after that conversation ended, Griffin called Dr. Seaman again because the man did not leave her home even though she could not answer his questions. She put the man on the line with Dr. Seaman again, who admits he was quite abrupt. Dr. Seaman sharply told the man to quit bothering Griffin and to leave her home immediately.

Troubled by that conversation, Dr. Seaman called Griffin about ten minutes later to see whether the man was still in her house. The telephone line was busy. He called again, but the line remained busy. Dr. Seaman then went to his appointment and returned home about two hours later. He tried to telephone Griffin, but every attempt resulted in a busy signal.

Dr. Seaman went to Griffin's home at about 12:45 p.m. He found her front door ajar. He looked inside and saw Griffin's bloody body on the living room floor. A large knife protruded from her chest and a bloody, broken toaster lay nearby. Later examination would reveal that she still wore her wedding ring, but its stone was turned inward toward her palm.

Dr. Seaman contacted the police. He told them that earlier in the morning he had spoken on the telephone with "a black man" who was in Griffin's home inquiring about his car. He also told the officers that the man said he worked at the Bluko Car Wash, located half a mile north on Keystone Ave-

nue. He said Griffin had previously given him the name, "Howard Allen," and the man's home telephone number. Dr. Seaman also told the officers that he was abrupt with the man in their two brief conversations and that Griffin's telephone line had been busy every time he called since then.

Police secured the crime scene at about 2:45 p.m., and two detectives went to the Bluko Car Wash, where they found Howard Allen. They asked him to go to the police station for questioning about an incident near the car wash, but did not inform him of the specific nature of the crime being investigated. Allen agreed and went with the officers to police headquarters. Allen was questioned concerning his whereabouts that morning, how he had travelled to work, and if he had shopped for a car. Allen told the police that he watched cartoons at home, hitch-hiked to work, and did not shop for a car because he was not licensed to drive.

The police questioned Allen throughout the afternoon and early evening at the police station. Although he was there for nearly six hours before his formal arrest, police officers testified that he was free to leave. Allen does not challenge this fact.

Around 8:45 p.m., Detective Crooke learned that investigators at Griffin's home found on a kitchen counter a slip of paper recording Allen's name and number. They arrested Allen formally at this time, and gave him *Miranda* warnings orally and in writing. At 8:50 p.m., Allen signed a waiver of rights form, and Detective Crooke then interrogated him. During this interrogation, Allen suggested that he be given a lie detector test. Detective Crooke summoned a polygraph specialist, and Allen ate dinner while they waited.

Detective Logsdon, the polygraph specialist, began examining Allen at about 11 p.m. Logsdon gave Allen oral *Miranda* warnings, the adequacy of which is now in dispute. Logsdon also gave Allen a second copy of the written *Miranda* warnings and waiver form. He instructed Allen to read the form; Allen then signed it. The interview lasted four hours. Afterwards, Allen was asked to give a formal statement, but declined because he was tired.

Ten hours later, after Allen had been allowed to sleep, Detective Wright gave him *Miranda* warnings and asked him if he would answer questions and give a statement. Allen expressed a desire to speak with his mother, which Wright accommodated. After speaking with his mother, Allen talked to Wright. Allen admitted to shopping for a car and to striking Griffin in the face, but not to killing her.

Meanwhile, forensic investigators continued their work; they failed to find any fingerprints at Griffin's home, but they did find the note with Allen's name and number on the kitchen counter. That countertop had been forcibly pulled away from the wall and a drawer left open. A broken and bloody toaster lay in the living room near Griffin's body, the living room telephone was off the hook. The bedcovers were turned back, and the slats in a closet door were broken. An empty camera box was on the floor.

The police later questioned Allen's coworkers and boss at the car wash. In doing so, they discovered Griffin's camera, which Allen had given to a co-worker to hold in his locker on the day Griffin was murdered. Shortly thereafter, a telephone lineman found Griffin's wallet on a nearby roof. It held no money.

The clothes Allen wore at the time of his arrest were spotted with blood. Allen's blood type is type "O," but the victim's was type "A." Laboratory analysis of the blood stains on Allen's clothes indicated a match with Griffin's blood type.

### B. Procedural History

Although this is a direct appeal, getting to this stage has been anything but direct.

At sentencing, Allen indicated to the trial court that he was dissatisfied with his attorney's performance. He told the judge about several persons he would have called as witnesses and described the testimony he would have elicited. Allen announced his desire to make an ineffective assistance of counsel claim. This led his lead trial counsel, Alex Voils, to move to withdraw his representation. The trial court denied this motion and

ordered Voils to prepare a motion to correct errors within sixty days.

Seeking to avoid the conflict Voils faced in drafting a motion to correct errors that alleged his own ineffectiveness, the court instructed him to prepare the motion without an ineffective assistance claim. The court assured Voils that it would permit him to withdraw after filing the motion. The court further assured both Allen and Voils that upon Voils' withdrawal it would appoint new counsel and would permit new counsel to file a belated motion to correct errors for the principal purpose of asserting Allen's ineffective assistance claim. The court also stated that new counsel would not be restricted to the ineffectiveness issue. The court indicated that it would then rule on both motions, in essence "trying to get direct appeal, PC one, and PC two all done at one time, if possible...." (R. at 3194.)

Forty-nine days later, on October 18, 1988, and well within the sixty days allowed by rule, Allen filed a *pro se* motion to correct errors. This motion contained, *inter alia,* claims that his trial counsel was ineffective and that a conflict of interest existed between him, Voils, and Judge Barney. Allen also alleged that Voils conducted himself unprofessionally due to racial bias against Allen. In a January 1989 hearing on the *pro se* motion, Voils was asked in open court about the status of the motion to correct errors the court had ordered him to prepare. He said the motion was "substantially complete" but that he refrained from filing it because of "the nature of the allegations contained in Defendant Allen's *pro se* Motion to Correct Errors...." (R. at 3204.) On this representation, the trial court allowed Voils to withdraw. The court then continued the case until it would appoint new counsel.

On March 27, 1989, Allen filed another *pro se* motion, this one captioned as a "Belated Supplemental Motion to Correct Errors." A hearing was not held, and the motion was denied nine months later in January, 1990. From this point, the proceedings languished for more than two years. The reasons for this delay are not recorded.

On March 1, 1992, the trial court appointed David Sexson and Stephen Sherron to represent Allen. Sexson was Voils' co-counsel at trial. Sherron filed a praecipe and initiated the appeal on March 18. Despite the filing of the praecipe, the court reporter, Judith Hatfield, did not prepare and transmit the record of proceedings to Allen's attorneys. This Court intervened, ordering Sexson and Sherron to appear with reporter Hatfield for a status conference at the Supreme Court on September 10, 1992.

After the status conference, this Court imposed a schedule for record preparation and briefing. We ordered compliance under the penalty of contempt, scheduling a contempt hearing for January 13, 1993.

Reporter Hatfield failed to comply with the schedule. After a hearing, we found Hatfield guilty of contempt. She was fined $500 and sentenced to seven days incarceration. *In the Matter of Hatfield,* 607 N.E.2d 384 (Ind. 1993). The record finally was transmitted to this Court on March 25, 1993.

Allen's attorneys received two extensions of time for preparation of his brief. A third petition for an extension of time was filed on September 3, 1993. We granted the extension, but under the penalty of contempt for attorney Sexson if this deadline was not observed. The brief was timely filed on October 25, 1993. It raised five issues in twenty-one pages, an extraordinarily thin product in capital defense practice. The State's brief was filed on January 31, 1994, and oral argument was scheduled for March 1. Then this case took another unusual turn.

On February 15, 1994, the Marion County Public Defender Board, by Chief Public Defender Fran Hardy, filed a petition asserting that the brief submitted by Sexson and Sherron was woefully inadequate. She requested the brief be withdrawn without prejudice and the case remanded for purpose of removing Sexson and Sherron and appointing new appellate counsel. Seven days later, we granted the petition, striking Allen's brief and removing Sexson[1] and Sherron. The Court canceled oral argument and ordered the

---

1. As a result of this abysmal performance, we eventually suspended David Sexson from the practice of law. *In the Matter of Sexson,* 666 N.E.2d 402 (Ind.1996).

Board, Chief Public Defender Hardy, and the Associate Presiding Judge of the Marion Superior Court, Criminal Division, to confer and identify suitable replacement counsel. The Court also set a five month deadline for Allen's brief so that replacement counsel would know the schedule to which the case would be kept before accepting Allen's representation.

The record of proceedings was released to Allen's present attorney, Brent Westerfeld, two days later. After he reviewed it, the trial court nominated him to represent Allen. He indicated his willingness to accept the case on March 7. We approved his appointment the next day.

Four months later, Westerfeld filed a petition for leave to file a belated motion to correct errors. The petition, filed on July 12, also requested the appointment of a new trial judge on remand. We denied the petition, but specifically permitted Allen to raise and argue in his appellate brief all issues which he would have included in a belated motion to correct errors. Both sides ultimately briefed the case, and we heard oral argument.

## II. Allen's Guilt–Innocence Phase Claims

### A. Fifth Amendment Claims

Allen claims that the State deprived him of his Fifth Amendment privilege against self-incrimination by violating his *"Miranda* rights" through trickery, deception, coercion, and false promises during his custodial interrogation at the police station between 11 p.m., July 14, and 3 a.m., July 15. Therefore, Allen argues, certain inculpatory statements he made during this interrogation should not have been admitted into evidence.[2] The inculpatory nature of Allen's statements is that

he was in Griffin's home, that he talked to "the doctor" (Dr. Seaman) on the telephone, and that he struck Griffin in the face.

■ Allen did not object at trial to police testimony regarding statements he made during custodial interrogation and thus failed to preserve the issues for appeal. Allen argues that the alleged errors were more than mere infractions of constitutional dictates; he claims they amounted to fundamental error and violations of due process. Because he bases a significant part of his ineffective assistance of counsel claims on the failure of his trial attorneys to object and because of our concern for due process, we address these claims as though properly before this Court.[3]

The Fifth Amendment provides that "No person ... shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend V. Cognizant of the matrix of values safeguarded by the Fifth Amendment, the U.S. Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), announced broad prophylactic measures to protect citizens interrogated while in custody. *Miranda* requires defendants to be adequately informed of their right to remain silent, that their statements could be used against them at trial, of their right to an attorney, and that the state will appoint an attorney for the defendant if he cannot afford one. *Id.* The purpose of requiring the *Miranda* warnings before custodial interrogation is to combat state-sanctioned coercion. A suspect's waiver of this valuable constitutional privilege, therefore, must be voluntary, meaning that it is freely given with knowledge and understanding of the underlying rights and privileges.[4] Although the result

---

**2.** Allen's statements came into evidence only by way of testimony from police officers who witnessed or participated in the interrogations. Neither a transcript nor tape of Allen's statements were ever offered at trial. The polygraph was not mentioned.

**3.** Although Allen also recites various sections of the Indiana Constitution as also having been violated in his prosecution, he makes no argument grounded in the state constitution in order to advance his claim. All such arguments are, therefor, waived. *St. John v. State,* 523 N.E.2d 1353 (Ind.1988).

**4.** *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612 ("[T]he prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege.... The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.").

Not only is the citizen required to be aware of his privilege not to incriminate himself, a Fifth Amendment interest, but also of his Sixth Amendment rights to the appointment and presence of counsel.

in *Miranda* is grounded in the Fifth Amendment privilege against state-compelled self-incrimination and the Sixth Amendment right to counsel, it is well-settled that the specific dictates promulgated in that opinion are not constitutionally mandated. *Miranda*, 384 U.S. at 478–79, 86 S.Ct. at 1629–30; *Duckworth v. Eagan*, 492 U.S. 195, 209, 109 S.Ct. 2875, 2883–84, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring).

■ After three decades of experience with *Miranda*, interrogating police officers commonly advise accused persons of their constitutional rights orally, and request suspects to sign pre-printed waiver of rights forms before initiating interrogation. The voluntariness of a person's waiver of rights is judged by the totality of the circumstances, *Light v. State*, 547 N.E.2d 1073 (Ind.1989), and a signed waiver form is one item of evidence showing that the accused was aware of and understood his rights. Thus, when challenged, the State may need to show additional evidence tending to prove that the accused's waiver and decision to speak were voluntary.[5]

Allen bases his claim on four arguments:

(A) that *Miranda* warnings were inadequate;

(B) that his waiver of rights was not voluntary;

(C) that interrogating officers failed to respect Allen's invocation of his right both to remain silent and to the presence of counsel during interrogation; and

(D) that his incriminating statements were a product of police coercion and deception.

Allen's fourth argument essentially duplicates his second, so we address them as one.

### (1) Adequacy of *Miranda* Advisement

■ Waiver of either the privilege against self-incrimination or the right to counsel cannot be presumed when police interrogate a person who is in custody without first advising him of his rights per *Miranda*; all evidence derived from the accused's subsequent statements must be excluded from the prosecution's case-in-chief. *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630. Thus, failure to warn the suspect of his rights renders all of his subsequent remarks while in custody involuntary per se, but properly administered warnings permit a trial court to find that all subsequent statements were voluntary.

Allen does not claim he was unwarned. He claims instead that the warnings he received immediately before the polygraph interview make his case "glaringly similar" to *Dickerson v. State*, 257 Ind. 562, 276 N.E.2d 845 (1972). *Dickerson*, however, dealt with a defendant's involuntary waiver of rights, not the inadequacy of the warnings he received. *Id.* at 849–50. The adequacy of *Miranda* warnings is a threshold matter; the voluntariness of his waiver follows. Allen's claim that *Miranda* advisements were inadequate requires only that the State prove the warnings were given and that they were sufficiently clear.

The record shows that Allen was first questioned by police officers at 2:45 p.m. and taken to the police station fifteen minutes later, where he remained until he was placed under arrest at 8:45 p.m. At that time, Detective Crooke told Allen that a note con-

The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record. *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

5. This issue comes before us in an unusual posture because Allen's taped polygraph interrogation was never the subject of a suppression motion, but rather a motion in limine seeking to limit the use of Allen's remarks. Insofar as the defendant sought the same result, exclusion of his incriminating remarks from the State's evidence against him, and because both motions are merely preliminary rulings that require a contemporaneous objection and final ruling at trial, we treat the claim as though it originated from a denial of a motion to suppress.

taining his name and telephone number [6] was found in Griffin's home and that Allen was now accused of her murder. Detective Crooke then read Allen the *Miranda* warnings, gave him a preprinted waiver form, asked Allen if he understood his rights, and asked him to sign the form if he was willing to waive his rights. Allen signed the waiver form, and interrogation commenced anew.

During this interrogation, Detective Crooke told Allen that he "didn't feel that he was being truthful." (R. at 2251.) At some point, Allen suggested he take a lie detector test. A polygraph specialist, Detective Logsdon, was called while Allen ate dinner. At about 11 p.m. the polygraph interrogation commenced. It was transmitted into an adjacent room for Detective Crooke to observe, and it was recorded on tape.

Logsdon loosely reviewed *Miranda* warnings with Allen. He embellished this explanation of Allen's rights by defaming half of practicing lawyers and suggesting that remaining silent might hurt him. Logsdon gave Allen a second *Miranda* waiver form, which he signed, but Allen's claim rests on Logsdon's remarks at this juncture.[7]

**6.** Expert handwriting analysis admitted into evidence indicated that the writing on the scrap of paper was Howard Allen's. (R. at 2449.)

**7.** Detective Logsdon's colloquy with Allen regarding his *Miranda* rights follows:

L: Well I guess we ought to get to the matter at hand here. My name is John Logsdon and I'll be giving this exam today. I just need you to sign a couple of forms after you get around to sitting up. You say was [sic] in Pendleton for ten years you probably know what a rounchy [sic] (Inaudible) I imagine
A: Yes.
L: Well still, I don't care if it's a vandalism or a witness to something, I always go through everything, not everybody knows these things. I'll explain them in detail. It's about like the police generally do. I think anybody who is four years old and who's ever watched TV in this country knows they have the right to remain silent any time they get around the police. Sometimes that can help and sometimes that can hurt. (Inaudible) helps out. You understand that you know. I'm not really planning on playing policeman but you are right down in the center of police headquarters. I'll play policeman, prosecutor, and defense attorney. (Inaudible) But anything you say can be used in court for you or against you on what we're doing here today. Now if you want to seek your counsel or you want something, counsel doesn't mean lawyer, it could be pretty much anybody.
A: (Inaudible)
L: You're not going to die on me are you?
A: I surely hope not.
L: You understand that if you wind up in court over this matter, they'll give you counsel you can't afford. I don't know what your statis [sic] is as far as money, some people can afford a good lawyer and some people can't, but you know if you don't tell them this thing, you know, and you can't afford (Inaudible) they'll appoint somebody for you. You got to understand, now the way I look at lawyers is, you know probably half the lawyers in this country graduated in the bottom half of their class. You realize that?
A: Huh uh.
L: Well you figure you get one that's in a good group like school kids, and one half the group graduates in the top half and the other has to graduate in the bottom right?
A: Yeah.
L: I guess if the judge thinks it possible, he could award you the class dummy of 1978 for an attorney. If that happens, best I understood they were talking about you can appoint somebody new. Once you (Inaudible) I'm not going to sit here and make you take this test. I came all the way down here, this is my day off. I'm here to help you out of the situation. You don't want something to go far as serious as this matter.
A: No. (Inaudible)
L: If you're going to be right with me I can help you out. I want you to know, I can't force you to take the test and I wouldn't want to. Matter of fact, if you were being forced to I imagine I wouldn't have had to come all the way down here. If you played football that long then I'm not going to force you into anything anyway.
A: OK.
L: That's right. Just me and you and any time you don't want to say anything, you got a mouth on you and you can close it any time or you can open it. You can do whatever you want to. This is your test, it's not mine, you. I'd have been perfectly happy sleepin (sic) at home.
A: (Laughter)
L: This is your test and it's all up to you.
A: OK
L: Why don't you look this form over here and sign your name right down there on the bottom line. That don't mean you have [sic] do anything. You understand that. Because I told you all that stuff. (Inaudible) I got one more form here. Now this form here says you're here voluntarily to take this test. It says, uh, the most important part really is that there is no medical reason why you shouldn't take this test today. Have you got anything wrong, have you ever been hospitalized for over two weeks for anything having to do with your brain or your heart or lungs?

Detective Logsdon's "explanation" was deplorable. If it had been the only warning to Allen, relief under *Miranda* would likely be appropriate.

■ We are not persuaded that earlier, proper warnings were rendered inadequate by Logsdon's performance. Allen does not contest that he was properly advised of his *Miranda* rights at 8:45, the moment he was first accused.[8] Allen, a seasoned criminal, told the officer that he understood his rights when so advised and, without threats, promises, or force, signed his name to the waiver form. Just two hours later, he signed an identical waiver form after again being orally advised and instructed to read the form. Despite Allen's protestations to the contrary, the record reveals that Logsdon instructed Allen that the polygraph interview was voluntary, that he could refuse to answer questions, and that he could stop the interview at any time. As a consequence, and in spite of its defects, Logsdon's oral advisement does not nullify the prior, proper advisement Allen received. The warnings were close in time, and Allen had already confirmed that he understood his rights. Logsdon's improper remarks may have affected Allen's subsequent decision to waive his rights—a question of voluntariness—but those remarks did not annul the proper written and oral warnings Allen received.

#### (2) Voluntariness of Statements

■ Allen first signed a waiver form and answered detectives' questions just before 9 p.m. Shortly thereafter, Allen suggested he be interrogated while monitored by polygraph. Allen does not claim he was tricked or otherwise coerced into answering questions during this period.

■ Instead, Allen attacks the validity of his waiver of rights at the outset of the polygraph interrogation and, as its "poisoned fruit," all subsequent statements he made. A waiver is an intentional relinquishment or abandonment of a known right. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Determination of whether a defendant's waiver of constitutional rights was voluntary is reviewed case-by-case and depends on the unique facts and circumstances of that case, including the defendant's background, experience, and conduct. *Id.*

Allen claims that he was tricked or coerced into signing the waiver of rights form at the polygraph interview. This argument is based on *Dickerson v. State*, where the defendant was asked to sign the waiver of rights form "if he understood it." 276 N.E.2d at 850. In that case, the officer who asked for the signature failed to give the defendant an oral advisement, to confirm the defendant's understanding of his rights, or to ask the defendant if he desired to waive his rights. The manner in which the officer asked for the defendant's signature could therefore have deceived him into thinking that his signature indicated only his comprehension of his rights, not that he was actually waiving them.

Allen's case is distinguishable because he voluntarily waived his rights subsequent to a proper advisement just two hours before. That first waiver was close in time and a significant link in the chain of events leading to the challenged waiver. He signed a waiver form a second time, and he was told he did not have to do anything. These circumstances, taken together, negate the claim that Allen was tricked into relinquishing his rights, even if Logsdon's remarks may have influenced Allen not to reclaim his rights.

Allen also claims his waiver was involuntary because he did not affirm his understanding of his rights. We are not persuaded. After all, he signed the waiver document after Detective Logsdon instructed him to read it. *Miranda* does not require an officer to provide the accused with "the quantum of knowledge which an attorney would require

(R. at 306–08).

8. Allen's briefs make assertions, however, that Allen's first warning and waiver were "ritualistically empty." (Reply Br. at 14.) Allen makes no cogent argument to support this claim. Essentially, the argument stands on a foundation that Allen is mentally retarded and could not understand his rights therefor. There is simply no evidence of this in the record, which is all that we may review. *See infra* Part IV(F).

before rendering legal advice." *Armour v. State*, 479 N.E.2d 1294, 1298–99 (Ind.1985). It is enough that Allen verbally confirmed his understanding of his rights. That he twice signed a document clearly spelling out his rights and specifically stating that he understood the same is also evidence that he waived them voluntarily. Just as a signed waiver document is not conclusive proof that the waiver was given knowingly and intelligently, freely and voluntarily, the defendant's signature cannot be dismissed simply because he disavows it after he is convicted.

Allen's suggestion that he be polygraphed also points toward a voluntary waiver. His remark clearly propelled events forward. Allen's willingness to speak while being physically monitored is clear, unrebutted evidence of the completeness of his waiver. Considering Allen's conduct, apparently normal mental capacity,[9] and extensive criminal record,[10] it is abundantly clear that Allen knew and waived his rights.

█ Allen argues that his incriminating statements must be suppressed because investigating officers allegedly failed to notify him of the reason for his interrogation. This argument was squarely rejected by the U.S. Supreme Court in *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).[11] The constitutional issue does not concern the tactical wisdom of the defendant's choice to speak, but only the defendant's voluntariness in choosing to speak.

### (3) Defendant's Invocation of Constitutional Rights

Allen asserts that his *Miranda* rights were violated by police officers who ignored his invocation of the right to remain silent and his demand for counsel. Specifically, he claims that he invoked his right to remain silent when he exclaimed, "Wait a minute, hold it, hold it," (R. at 338), and that he invoked his right to counsel when he asked to speak to his mother.

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Court held that a confession obtained in an interrogation initiated some time after a suspect cut off earlier questioning did not violate *Miranda*. Evidence obtained in this way may be admissible even though a subsequent interview was initiated by an officer, so long as the police scrupulously honor the defendant's right. *Id*. The Court reasoned that *Miranda* does not forever prohibit law enforcement officials from speaking to a suspect once she decides not to speak; room is left for the officer to inquire whether the suspect has changed her mind and decided to speak. When an officer ceases questioning at the time a suspect indicates she is not willing to answer and, prior to any subsequent questioning, the suspect is again advised of her

---

9. Allen relies on *Robbins v. State* for the proposition that a confession must be "the product of a rational intellect and of free will." 250 Ind. 219, 225, 235 N.E.2d 199, 203 (1968). After our decision in *Robbins*, the Supreme Court made it clear that the lodestar of Fifth Amendment analysis is police coercion. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

10. Some weight must be ascribed to his familiarity with the interrogation process. *See Poore v. State*, 681 N.E.2d 204, 207 (Ind.1996) ("significant criminal history suggests a high level of familiarity with the judicial process") (citations omitted).

11. The Court said:

Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right—'his right to refuse to answer any question which might incriminate him.' 'Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.' We have held that a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affect his decision to confess.' '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' Here, the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature. Accordingly, the failure of the law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner. *Colorado v. Spring*, 479 U.S. 564, 576–77, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987) (citations and footnotes omitted).

rights, the suspect's rights have been respected if she then decides to speak. *Id.*

Allen's exclamation, "hold it," was simply not an invocation of the right to remain silent. In context, it is readily apparent that Allen's exclamation was nothing more than an instantaneous reaction to learning that the polygraph indicated a lack of truthfulness when he was questioned about the murder weapon. (R. at 334–38.) Allen did not communicate by words or conduct a desire to cease answering questions. We conclude that Allen did not invoke his right to cut off questioning.

A similar outcome befalls Allen's claim that the police denied his right to counsel. The right to counsel during custodial interrogation is more profound than the right not to speak and, once invoked, it cannot be waived except upon the initiation of the accused. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. The *Edwards* Court emphasized the inconsistency with *Miranda* that would attend a rule permitting law enforcement authorities, "at their insistence, to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel." *Id.* at 485, 86 S.Ct. at 1633 (emphasis added).

Allen argues that he did not understand the meaning of the word "counsel" because Logsdon misled him. He points to Logsdon's improper remark that "counsel doesn't mean lawyer, it could be pretty much anybody," (R. at 307), followed by Allen's requests to speak to his mother. Still, the totality of circumstances does not show that Allen clearly asserted a desire for the advice or presence of counsel.

Examination of Logsdon's dialogue with Allen shows that Allen was aware of his right to an attorney but showed no interest in speaking to one. It is readily apparent that Logsdon wanted Allen not to change his mind about doing the polygraph interrogation, but Logsdon did in fact talk to him about lawyers and the appointment of an attorney in addition to making the "pretty much anybody" remark. Allen responded each time. Logsdon then presented Allen with a *Miranda* waiver form, suggested he read it, told him "[t]hat don't mean you have

[to] do anything," and referred to the advisement of rights. (R. at 308.) Allen signed it. He never demonstrated confusion about the meaning of "counsel" and did not show interest in the advice of counsel.

Some fifteen to thirty minutes later, Allen first requested to speak to his mother. He said he had wanted to talk to her since early in the evening to "let her know what's happenin[g]." (R. at 323.) Logsdon responded that he would ask other officers to contact her and then he left the room. When he returned, he told Allen he had spoken with an officer who had gone to his mother's home and talked to her. Allen would not mention his mother again for half an hour. On the basis of this exchange, we conclude that Allen did not clearly assert his right to counsel when he asked to speak with his mother.

We reach the same conclusion with respect to Allen's second and third requests to speak to his mother. No reason exists for this Court to find that Allen was actually invoking his constitutional rights because there is no evidence of him conceptually linking "mother" with counsel, attorney, lawyer, or rights. Allen asked to speak to his mother only when his story began collapsing under the weight of negative polygraph results.

### (4) A Claimed Violation of *Doyle*

The essence of the Supreme Court's holding in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), is that a defendant's silence after he has been advised of his rights cannot be used to obtain a conviction by implying that the silence is rooted in guilty knowledge.

Allen talked for nearly six hours, including four after his second warning. The police asked him to give a written statement, but he declined. His rights were respected, and no misuse was made of this fact. The next afternoon he was advised of his rights again and gave a voluntary statement. He simply was not silent. Without the defendant's silence being used to suggest that he "silently confessed," there is no *Doyle* violation.

### B. Did the Prosecutor Use Perjured Testimony?

Allen asserts the prosecutor used perjured testimony of police witnesses and

relied on that testimony in closing argument. The alleged perjury occurred when officers testified they had not told Allen specific facts regarding the crimes against Griffin. Allen says they had given him some specific facts. Thus, when the prosecutor in closing argument asserted that the only way Allen knew about the murder was that he was the perpetrator, the allegedly false police testimony may have improperly bolstered the weight of Allen's incriminating statements and thus "had an effect on the outcome of the trial." *Napue v. Illinois*, 360 U.S. 264, 272, 79 S.Ct. 1173, 1179, 3 L.Ed.2d 1217 (1959).

Allen provides no evidence showing the particular testimony he challenges is false. Absent such a showing, this claim lacks substance. The challenged portion of the prosecutor's summation refers to conversations police officers had with Allen *before* his interrogation by Logsdon. Accordingly, the prosecutor's closing argument was based on legitimate evidence. .

### C. A Hearsay Claim

■ Allen contends the victim's statements to Dr. Seaman were hearsay and should have been excluded from evidence. Allen's trial counsel, however, did not object when Dr. Seaman testified. Failure to object at trial waives any claim of error and allows otherwise inadmissible hearsay evidence to be considered for substantive purposes and to establish a material fact at issue. *Banks v. State*, 567 N.E.2d 1126 (Ind.1991). Nevertheless, we address Allen's claim on the merits because the decision not to object impacts his ineffective assistance of counsel claim.

■ Hearsay is an out-of-court statement offered at trial to prove the truth of the matter asserted. *Blue v. Brooks*, 261 Ind. 338, 303 N.E.2d 269 (1973). Hearsay may not be admitted as substantive evidence unless it comes within one of the recognized exceptions to the hearsay rule.

■ The substance of Griffin's remarks to Dr. Seaman was that the man who shopped for his car on July 13 wrote his name and telephone number on a piece of paper that he left with her. Allen contends this permits the trier of fact to infer that Allen was present and wrote the note found in Griffin's home. The State responds that the remarks were not hearsay because they were not offered for the purpose of proving that Allen wrote the note or that Allen was present, but for the purpose of explaining the course of Dr. Seaman's conduct. This conduct included writing Allen's telephone number on his own note, calling Allen's residence that evening, and, ultimately, directing the police to Allen's place of employment.

Allen's claim is plausible but unconvincing. We conclude that Griffin's statements were not hearsay and would properly be admitted to show their effect on Dr. Seaman and to explain his conduct. Griffin's comment that a "black man" wrote the note simply does not prove that Allen was the writer. In contrast, the prosecutor followed Dr. Seaman's testimony with a line of questions that laid an evidentiary foundation for the admission of Dr. Seaman's handwritten note containing Allen's name and home telephone number and his testimony that he called that number. This line of questioning demonstrates that Griffin's statement was used for the purpose stated and thus was not hearsay. We cannot say that, had an objection been lodged and overruled, the ruling would have been an abuse of discretion. *See Boyd v. State*, 494 N.E.2d 284 (Ind.1986), *cert. denied* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).[12]

### D. Autopsy Pictures

■ Allen claims that the admission into evidence, without objection, of several slides of Griffin's autopsy was cumulative and gruesome, and amounted to fundamental error.[13] Allen particularly objected to a slide

---

**12.** *The same is true, for slightly different reasons,* of Dr. Seaman's testimony concerning Griffin's statement that the same man had returned to inquire about the car.

**13.** The doctrine of fundamental error permits an appellate court to avoid the ordinary rules of appellate procedure in order to address a claim of error not raised in the trial court but which

claims a deprivation of fundamental due process. *Reynolds v. State*, 460 N.E.2d 506, 508 (Ind. 1984). To be "fundamental error" it must constitute a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively. *James v. State*, 613 N.E.2d 15, 25 (Ind.1993). This means that

that displayed a contusion to Griffin's skull by way of the coroner peeling back part of the scalp. (Exhibit 94–10.)

The admission of the slides was not an error, much less fundamental error. All the pictures depicted injuries suffered by the victim and each could be described by a witness via oral testimony, thus meeting the general criteria of admissibility for photographs. *Phillips v. State,* 550 N.E.2d 1290 (Ind.1990). Admission of pictures of a homicide victim is not reversible error if the pictures are relevant and the relevance is not outweighed by a tendency to inflame or impassion the jury against the defense. *Webster v. State,* 426 N.E.2d 1295 (Ind.1981). Although the slides are close-ups of Griffin's injuries, none of the pictures at issue are especially inflammatory. It is not immediately apparent that Allen was (or would have been) deprived of a fair trial by their admission.

As for the particular slide in which Griffin's scalp is peeled back, Exhibit 94–10, we agree with Allen it was erroneously admitted. Although the State argues the slide showed a potentially mortal wound otherwise obscured by the victim's hair, autopsy photographs are generally inadmissible if they show the body in an altered condition. *Loy v. State,* 436 N.E.2d 1125, 1128 (Ind. 1982) ("Such a display may impute the handiwork of the physician to the accused assailant and thereby render the defendant responsible in the minds of the jurors for the cuts, incisions, and indignity of an autopsy."). An objection to this slide's admission probably would have been sustained because the relevant fact substantiated by the slide was cumulative of other evidence of Griffin's cause of death. Still, the slide's admission was not fundamental error. While the slide reveals a deep wound and is certainly unpleasant to view, its admission was harmless in view of the overwhelming evidence properly admitted to prove the cause of death.

irremediable prejudice to a defendant's fundamental right to a fair trial must be immediately

### E. Jury Instructions

Allen claims he was denied due process by the trial court's refusal to instruct on the lesser included offense of theft on Count III, the robbery charge. Although a guilt-phase issue, the gravity of this claim is its potential effect on sentencing: a verdict of guilty for theft instead of robbery would have prevented the State from proving the charged death penalty aggravator, intentional killing during the commission of a robbery. Ind.Code Ann. § 35–50–2–9(b)(1) (West 1986).

Indiana courts utilize a three-step process for determining whether an instruction on a lesser included offense must be given. *Wright v. State,* 658 N.E.2d 563 (Ind.1995). First, we read the language of the charging document to determine whether the alleged lesser included offense is *inherently* included in the crime charged. *Id.* at 566. If the offense is inherently included in the greater, then the trial court proceeds to step three. But, if the court determines that it is not inherently included, then the court must take the second step of comparing the statute that defines the alleged lesser included offense with the charging instrument in order to determine if the lesser offense is factually included in the charge. *Id.* at 567. Finally, once the trial court has determined that an lesser offense is included either inherently or factually, the court must look at the evidence presented by both parties to decide whether "there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense" such that a jury could conclude that the lesser included offense was committed but not the greater. *Id.* If the answer to this question is yes, then instruction on the lesser included offense must be given, and failure to do so is reversible error. *Id.; Gordon v. State,* 499 N.E.2d 228 (Ind.1986). This rule has been recognized as constitutional by the Supreme Court. *Beck v. Alabama,* 447 U.S. 625, 636 n. 12, 100 S.Ct. 2382, 2389 n. 12, 65 L.Ed.2d 392 (1980) (citing with approval *Pruitt v. State,* 269 Ind. 559, 382 N.E.2d 150 (1978) (test for whether refusal of

apparent in the disputed evidence or argument.

instruction on lesser included offense is error is whether evidence was adduced at trial to which the lesser included offense instruction was applicable)). Nevertheless, Allen would have us alter the rule depending on either the circumstantial or direct nature of the evidence or whether, without regard to the evidence, the State has negated every theory of defense conceived by counsel. We decline.

■ Applying the process outlined above, we conclude that the trial court was correct in denying Allen's request for an instruction on theft. Theft is a lesser included offense of robbery, *Landers v. State*, 464 N.E.2d 912 (Ind.1984), but there is no evidence of simple theft in the record. In fact, the evidence points the other way. The crime scene is a picture of violence. The victim lies with a knife in her chest. A bloody and broken toaster lies near her head. There is damage to a closet door, a kitchen counter, and so on. A camera box sits without the camera. All in all, plenty of force and evidence of missing property.

Against this evidence, Allen's counsel suggests, for instance, that perhaps the victim had given Allen the camera, or that he may have gained it on some other day. This speculation does not create a "serious evidentiary dispute." The trial court correctly refused to instruct on theft.

### F. Should a Competency Exam Have Been Ordered *Sua Sponte*?

■ Allen correctly states that a trial court is obligated to conduct a psychiatric examination and competency hearing "where 'reasonable grounds' exist for believing the defendant is incompetent to stand trial." (Appellant's Br. at 114 (citing Ind.Code § 35-36-3-1)). We review a trial court's decisions on this point for abuse of discretion. *Walker v. State*, 621 N.E.2d 627 (Ind.1993). We can see no reason why the trial court had the duty to act of its own accord as Allen now claims.

■ Allen contends that notice of the insanity defense filed by his first attorney put the court on notice of his incompetence to stand trial. He maintains that the mere fact that this notice was filed obligated the trial court to order *sua sponte* a psychiatric evaluation. Allen argues this in spite of the fact that his appointed trial counsel withdrew both the notice and the motion for psychiatric examination (which had been granted) when abandoning the insanity defense. Essentially, present counsel asks us to oblige trial courts to second-guess defense counsel's strategy when the insanity defense is abandoned. We will not. A trial court is permitted, if not expected, to rely on the strategic judgment of counsel. In any event, a request for psychiatric examination is not evidence of incompetency. *Cook v. State*, 258 Ind. 667, 284 N.E.2d 81 (1972).

There is no record of police awareness of Allen's alleged mental incompetence prior to or during interrogation. Likewise, there was no evidence tending to give the trial court reason to suspect that Allen was mentally retarded. We find no error.

### III. Effective Assistance of Counsel Claims

Allen makes a plethora of arguments in support of his claim that he received ineffective assistance of counsel. These arguments attack his representation in the guilt and penalty phases of his trial and on appeal. Accordingly, we set out the standard for judging ineffectiveness claims first and then address Allen's arguments in chronological order.

The standard governing claims of ineffective assistance of counsel was set out by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test requires a defendant to show that his or her counsel's representation both fell below an objective standard of reasonableness, *id.* at 688, 104 S.Ct. at 2064-65, and prejudiced a defendant's case such that confidence in its result is undermined. *Id.* at 694, 104 S.Ct. at 2068. Counsel is presumed effective. Thus, the burden of proving counsel's ineffectiveness rests squarely on the shoulders of the claimant.

### A. Effectiveness of Counsel During Guilt Phase

Allen asserts that his trial counsel committed errors which rendered his assistance constitutionally defective. These are counsel's

failures to: file a motion to suppress Allen's incriminating statements, object to testimony regarding Allen's right to cut off questioning, object to testimony regarding the victim's hearsay statements, request a competency examination for Allen, tender an instruction on theft as a lesser included offense of robbery, and develop and present evidence of mental retardation. The only colorable claim not addressed elsewhere in this opinion involves the lack of a motion to suppress.

■ Although the strategic decision not to file a motion to suppress Allen's custodial interrogation might be considered an unusual defense practice, especially in light of Allen's colorable claim based on Detective Logsdon's terrible *Miranda* advisement, the fact that the motion was not made does not render the whole of counsel representation ineffective, nor does it prove that the verdict was unreliable.

Allen relies on *Pemberton v. State,* 560 N.E.2d 524 (Ind.1990), in which we reversed a conviction on the basis of ineffective assistance because counsel failed to preserve an issue of constitutional magnitude for appeal. The issue disputed in *Pemberton* was an improperly suggestive "show-up" of the two defendants, which was admitted as evidence of out-of-court identification. The issue was fully aired in a hearing on a pre-trial motion to suppress, but counsel failed to lodge a contemporaneous objection at trial. Having already focused the court on the identification issue and invested so much energy in battle over it, the failure to object at trial was inexplicable. We held counsel's performance deficient because the omission led to waiver of an issue which might have directly affected the trial's outcome, *Strickland's* prejudice prong.

This case does not square with *Pemberton.* Trial counsel's decision to file a motion in limine instead of a motion to suppress could

well have rested on strategic reasons. Allen's present counsel calls the decision to rely on a motion in limine "baffling," but he tenders no argument explaining why the choice of tactics was deficient and prejudicial. There was strong evidence other than Allen's own admissions that placed him in Griffin's home at the time of her murder, including evidence of Griffin's blood on Allen's clothing, so defense counsel argued that Allen was not guilty of murder because he was overcome by sudden heat when the victim insulted him with racial epithets and threatened him with a knife. This strategy was not unreasonable, and it was entirely consistent with Allen's admissions. Defense counsel may have calculated that the risk of having the entire polygraph interrogation placed before the jury was too great (in case a motion to suppress was denied) and that control over the use of this evidence was more valuable than its unfettered admission.[14]

Most important, however, is that Allen's statements were the source of counsel's argument imploring the jury to consider convicting him on just the lesser included charge of voluntary manslaughter. If this strategy had succeeded, it would have spared Allen the death sentence. The strategic decision not to file a motion to suppress Allen's statements therefore did not deprive Allen of fair adversarial testing of the evidence. In the absence of solid appellate argument showing the folly of such strategy, we opine no further about the soundness of the single decision not to file a motion to suppress. Isolated poor strategy, inexperience, or bad tactics do not necessarily amount to ineffectiveness of counsel. *Pemberton,* 560 N.E.2d at 526.

Assuming for the sake of argument that counsel's failure to file a motion to suppress is performance so deficient as to meet the first prong of *Strickland,* we do not see prejudice sufficient to satisfy the second

---

14. Recall that Allen suggested his being polygraphed, a fact that would surely have been adduced to demonstrate the voluntariness of his remarks, and that Allen changed his story when confronted with negative readings on the polygraph. It is probable that defense counsel would have preferred not to show the jury that he backpedaled in the face of negative polygraph readings.

Plus, during that interrogation Allen identified his own handwriting on the note with his name and telephone number found in Griffin's kitchen. R. at 354. This fact was not exploited at trial, but it surely would not have gone unnoticed by the jury had the entire transcript been read into evidence.

prong of that test. The case against Allen was so strong there is not a reasonable probability that the verdict might have been different but for counsel's alleged "error."

As for Allen's claims that defense counsel erred by not objecting to the admission of testimony about the exercise of his right to cut off questioning, counsel's failure to object was not deficient because there was no error to which he could take exception. *See supra* Parts II(A)(3). Counsel's failure to object to the introduction of Griffin's out-of-court remarks to Dr. Seaman and the omission of tendering in writing a jury instruction on theft are unavailing for the same reason. *See supra* Part II(C) and Part II(E).

Allen's claims that counsel was ineffective during the guilt phase because he failed to request a competency hearing and introduce evidence of mental retardation are similarly groundless. *See supra* Part II(F). Allen's competency was never in question, and, judging by the eight page dialogue he had with the trial judge at the sentencing hearing, Allen was fully aware of the nature of the proceedings and capable of assisting in his defense. (*See* R. at 3173–81.) The fact that defense counsel failed to perceive incompetence or mental retardation in his client, when his client gave him no reason to so perceive, is not ineffective assistance.

To summarize, the reliability of Allen's convictions for robbery and felony murder were not undermined by his attorney's representation. The convictions flowed from the evidence, which was tested by cross-examination and interpreted for the jury in the argument of counsel. Allen was not denied his right to effective assistance of counsel during the guilt phase of his trial.

### B. Effectiveness of Counsel During Penalty Phase

Allen argues four grounds to support his claim of ineffective assistance of counsel at the penalty phase. These are counsel's failures to: present evidence to rebut the charged statutory aggravator, present coherent closing argument, develop and present mitigatory evidence, and object to admission of allegedly false evidence or put on rebuttal evidence at the sentencing hearing.

#### (1) Failure to Present Rebuttal Evidence

 By stipulation, the guilt phase evidence was incorporated into the penalty phase hearing, an ordinary procedure in capital cases. This included evidence of Griffin's autopsy, which showed that she had been struck forcefully about the head before and after being stabbed to death. Griffin was seventy-four years old and partially disabled because of childhood polio. The first blows knocked her to the floor. Laying prone, unable to right or defend herself, a large knife taken from her kitchen was plunged into her chest. Finally, she was struck about the head with a toaster. The physical evidence shows there can be no doubt that Ernestine Griffin was intentionally killed.

There was little evidence defense counsel could cite to rebut a finding of intentional killing, but he certainly did not concede proof of the statutory aggravator. Rather, he made the best effort he could by attacking the credibility of the evidence, a tactic which did not require introduction of new evidence. His decision to attack the existing evidence was all he could do. It was objectively reasonable and not ineffective under *Strickland.*

#### (2) Incoherent Argument Claim

 Appellate counsel's argument that Alex Voils' closing argument to the jury was incoherent is nothing more than a personal attack. Voils' argument was indeed coherent and was directed at what he perceived to be the weakest link in the State's case. On its face, this claim lacks merit. Worse yet, it is the type of argument likely to have a chilling effect on the willingness of members of the defense bar to try capital cases. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066 (warning that abuse of the ineffectiveness challenge could "dampen the ardor ... of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.")

#### (3) Failure to Develop and Present Mitigating Evidence

Appellate counsel attempts to shoehorn a claim that Allen is mentally retarded into this direct appeal by asserting that trial counsel did not investigate. *See infra* Part IV(C). As we explain later, the trial court's

examination of present counsel's submissions on remand suggest that the evidence trial counsel offered covered the territory with some accuracy.

### (4) Counsel's Performance at the Sentencing Hearing

Allen makes a two-pronged argument urging this Court to vacate his sentence and remand for a new sentencing hearing based on his counsel's performance at the final sentencing hearing. The grounds of this argument are that counsel allowed the trial court to consider false evidence by failing to object or to rebut. The allegedly false evidence included, *inter alia*, documentation that Allen possessed normal intelligence, completed the eleventh grade, and came from a nurturing and loving family. These statements were contained in the pre-sentence report, which contained reports from Allen's prior convictions and parole applications.

The State counters that the evidence was neither false nor unreliable and that Allen fails to show the falsity of the challenged evidence. Essentially, the State responds that no error was committed under *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (death sentence vacated when a charged aggravator was premised on materially inaccurate, prejudicial evidence), and thus the sentence must stand.

■ Neither party persuades us. The State correctly points out that this case is not similar to *Johnson*,[15] but it misses the crux of

Allen's argument. Nevertheless, we conclude that Allen was not deprived of effective assistance of counsel by his attorney's response to the challenged evidence.

The gravamen of Allen's claim is that his trial attorney "abandoned" him by not challenging the allegedly untrue evidence. There was no reason for defense counsel or the trial court to doubt the veracity of the evidence Allen now challenges. All of the statements regarding Allen's I.Q. and level of education were contained in official documents pertaining to Allen's prior offenses and applications for parole.[16] These documents are entitled to a high degree of credibility. If a factfinder is to discredit such evidence, then the claimant must offer some credible evidence tending to show the unreliability of the challenged statements.[17] In the absence of evidence of misconduct or error in the administration of tests or the preparation of documents, trial counsel is not ineffective for not attempting a futile endeavor.

Likewise, trial counsel had no reason to doubt the veracity of evidence about Allen's home and family life contained in the same official documents. Present counsel writes, "Trial counsel did not inform the court the evidence before it was false and, had counsel known the evidence was false, there exists no sound strategy reason for failing to inform the court of the 'truth'." (Appellant's Br. at 145.) This argument, however, runs contrary to the testimony Allen's sister April[18] and his mother Ruby[19] provided during the

---

15. The distinguishing feature of *Johnson* is that the trial court considered a prior, *vacated* conviction as a death penalty aggravator. Here, the allegedly unreliable evidence was not used as an aggravator, i.e., to channel Allen into the class of death eligible defendant.

16. The challenged documents dated back to 1967, when Allen was convicted of his earliest adult offenses. As the State rightly points out, some documents included statements showing Allen to possess a lower I.Q. and a lower level of education—statements to which Allen, of course, does not object.

17. Counsel makes much of the fact that the test which measured Allen's I.Q. at 104 was the Beta I.Q. Test, which is much challenged in capital litigation.

18. The record contains this exchange between defense counsel and April Allen on direct examination:

> Voils: How would you describe Howard Allen?
> Allen: Nice, caring, loving, just like a brother.
> Voils: Did he—did he attempt to help you in any regards or in any ways?
> Allen: Yeah.
> Voils: Okay. In what ways?
> Allen: Well, a lot of ways: money, my kids. He helped me all the time, talking to me, telling me right from wrong, stuff like that.
> Voils: Okay. Now, you say he helped you—he helped with the money. How would you describe your family if you would.
> Allen: Like stick by each other.
> (R. at 3113.)

19. The record contains this dialogue between defense counsel and Ruby Allen on direct examination:

sentencing hearing before the judge. It is clear that Allen was not denied effective assistance of counsel because of a failure to object to the admission of statements found in government documents which were identical in content to those of his own mother and sister.[20]

## C. Abandonment by Counsel in the Appellate Process

Allen argues that he was denied the assistance of counsel at the "critical motion to correct errors stage." This is an attempt to fit his case under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and thereby avoid *Strickland* analysis. In *Cronic*, the Supreme Court indicated it had uniformly found constitutional error without any showing of prejudice when a defendant was denied the assistance of counsel at a critical stage of the proceedings. *Id.* at 659 n. 25, 104 S.Ct. at 2047 n. 25. If the motion to correct errors is a "critical stage of the proceedings," then Allen's claim has merit.

> Voils: I understand. What else can you tell— tell us about Howard as he got older?
> R. Allen: Well, after he served a period of time in—at jail, he, when he got out, the kids in the neighborhood they always gathered at my house. He would teach them karate and tell them what the options was to going to prison and stuff like that and try to keep them, you know,—even the kids in the neighborhood now where I live at, they could tell you that he was always on them about doing things. One boy, he said if it wasn't for him, he would be in Juvenile now, and I wish I could have brought him down today but I think he went to school.
> Voils: Okay. And is there anything else you'd like to tell the Court at this time about your son?
> R. Allen: Well, all I can tell you that he was always trying to joke and make people laugh and we always had a good time. My family—(unintelligible)—together. We always believed in families sticking together, you know.
> (R. at 3121.)

**20.** Similar sentiments were also expressed in many of the letters written to Judge Barney which were admitted as an appendix to the presentence investigation. *(See* R. at 233–55.)

**21.** Allen was not denied counsel by any conduct of the trial court or this Court, each of which appointed counsel for him and each of which

The motion to correct errors was once a critical stage in Indiana practice because of its jurisdictional role in marshalling the issues for appeal. It is, however, no longer critical for this purpose. Thus, a claim under *Cronic* cannot be sustained when a defendant is denied counsel, either actually or constructively, at the motion to correct errors stage.

Allen's claim is unusual in that it straddles a rule change: the motion to correct errors was still a jurisdictional stage of the proceedings at the time of his trial. Since then, we have amended Trial Rule 59 so that the motion to correct errors is no longer a condition precedent to appellate jurisdiction. We took stock of the rule change and immunized Allen from procedural default by specifically affirming Allen's right to raise any and all issues on appeal when we removed David Sexson and appointed new counsel and struck Sexson's brief. As a result, even though the motion to correct errors was a critical stage at the time of Allen's conviction, the prejudice owing to any lack of representation has been removed.[21]

specifically tailored its orders so that the defendant could receive competent representation. Allen filed a *pro se* motion to correct errors, but his trial attorney filed nothing. He claims that he needed to file his *pro se* motion because his attorney abandoned him. The record of the hearing on Allen's *pro se* motion likewise does not support this. Allen's counsel appeared at the hearing on the *pro se* motion. He stated that he had drafted a motion that was "substantially complete," but had refrained from filing it due to his client's assertions of ineffective assistance. (R. at 3204.) Allen's allegations in the motion added to those he aired at the sentencing hearing. (R. at 3173–81.) Thus, Allen's *pro se* motion effectively preempted counsel's work in preparing the motion. There was an irretrievable breakdown in the attorney-client relationship at that point. Attorney Voils' reticence in continuing his representation of Allen was reasonable and prudent under the circumstances.

Although a criminal defendant has the right to direct his representation even when counsel is appointed, the defendant cannot manipulate the State's appointment of counsel in order to avoid trial or sentencing. It is simply not true that Voils abandoned Allen; rather, Allen forsook his attorney. Allen's conduct, understandably desperate, did more to nullify the effectiveness of his attorney than any strategic choice or error his attorney made. Allen has no claim of denial or abandonment under *Cronic* or *Strickland*.

## IV. Penalty Phase Claims

Allen asserts that during the sentencing phase of his trial he was denied the right of confrontation by the trial judge's communication with the jury out of his presence, he was denied a speedy appeal, he is mentally retarded and therefore cannot be sentenced to death and that his death sentence is unconstitutional because it is based on non-statutory aggravators and improper evidence of the victim's character.

### A. Right of Confrontation With the Jury

Allen claims he is entitled to a new penalty phase hearing because his right of confrontation was violated when the trial judge engaged in *ex parte* communications with the jury during deliberation. As a technical matter, he is correct in noting the error. *Brown v. State*, 543 N.E.2d 1120 (Ind.1989). The error did not prejudice Allen's substantial rights, however, and therefore does not entitle Allen to a new penalty hearing.

The two *ex parte* communications Allen cites were responses from the judge to two written questions from the jury:

> We have not complete (*sic*) our deliberations yet, but we would like to know what happens if we find it impossible to reach a unanimous decision.

And,

> We do not feel we can reach a decision on a recommendation right now—is it possible to stop tonight and resume tomorrow?

The trial judge responded in writing:

> Please reread all the instructions. Thank you. And,
>
> > We have dinner arranged for you this evening for around 7:30 pm.
> >
> > In response to your question: it is possible to stop tonight and resume tomorrow.

(R. at 216–17.)

▬ The Indiana Constitution, art. I, § 13, guarantees a criminal defendant the right to be present at all stages of the proceedings by protecting an accused's rights to a public trial by an impartial jury. This right may be waived by the defendant. *Harris v. State*, 249 Ind. 681, 231 N.E.2d 800 (1967). A defendant's absence from any stage of the proceedings gives rise to a presumption that prejudicial error has occurred; the burden is on the State to rebut the presumption. *James v. State*, 613 N.E.2d 15 (Ind.1993).

▬ To rebut, the State points to *Hogan v. State*, 274 Ind. 119, 409 N.E.2d 588 (1980). In *Hogan*, we affirmed a conviction by holding a judge's face-to-face *ex parte* order to the jury to "read the instructions" was harmless error. Insofar as Judge Barney's communication to the jury was done in a one-sentence note, and thus more attenuated than face-to-face communication, we conclude this was harmless error.[22]

Regarding the second communication, we consider it frivolous to claim prejudice from the trial judge's communication to the jury about dinner and breaking for the night.

### B. Speedy Appeal

Allen contends that he was denied due process because of excessive delay in his appeal. He maintains that a criminal defendant's appeal of right is rendered meaningless if state procedures make it difficult or impossible to be heard. *See Harris v. Champion*, 15 F.3d 1538 (10th Cir.1994) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976))

▬ A right to a speedy appeal is not contemplated within the Sixth Amendment. *Gajdos v. State*, 462 N.E.2d 1017 (Ind.1984); *accord United States v. Alston*, 412 A.2d 351, 355 n. 7 (D.C.1980). A criminal defendant

---

**22.** Allen argues that the jury may have been confused as to whether they needed to agree unanimously on the aggravating circumstance before proceeding with the weighing process or that it was required to make a unanimous finding of mitigating circumstances before considering them. This argument is a non-starter because it fails to demonstrate prejudice. The proper procedure would have been for the trial court to call the jury back into open court in the presence of the parties and counsel and to reread the instructions to the jury without additional comment. *Alexander v. State*, 449 N.E.2d 1068, 1073 (Ind. 1983).

must be afforded equal protection and due process of law, however, so appellate delay is not "beyond the scrutiny of the federal Constitution." [23] *Gajdos*, 462 N.E.2d at 1023. Two tests have emerged for assessing speedy appeal claims. The "majority rule," requested by petitioner, is a slightly modified version of the four-pronged speedy trial standard adopted in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); the "minority rule" is a two-step analysis focusing on prejudice, if any, to the defendant caused by the government's delay. *Alston*, 412 A.2d at 359. The tests are similar in that both emphasize the importance of prejudice to substantial rights. The principal differences between the tests are that the *Alston* test does not consider whether the defendant asserted her right to a timely appeal, nor does it weigh the length of delay for any reason other than its prejudicial effect. *Id.* The majority of federal circuits that have addressed this issue have utilized the *Barker* test, as has our own Court of Appeals. *Wright v. State*, 591 N.E.2d 1053 (Ind.Ct.App.1992). Allen urges this Court do the same.

We conclude that Allen does not prevail even under the *Barker* test he requests. The *Barker* test's four prongs are (1) the length of delay, (2) the reason for the delay, (3) the petitioner's assertion of his right to timely adjudication of his appeal, and (4) the prejudice attaching to the defendant as a result of excessive delay. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192. Three types of prejudice have been recognized within the fourth prong: oppressive incarceration, constitutionally cognizable anxiety pending the appeal's disposition, and impairment of the defendant's substantial rights either on appeal or in a new trial. *Harris v. Champion*, 15 F.3d 1538, 1547 (10th Cir.1994). Because the inquiry examines the legal process afforded the claimant, each case turns on its peculiar facts, and the claimant must make a particularized showing of prejudice caused by any excessive delay. *Id.* at 1559. The available remedies range from expediting the appeal to dismissing the underlying criminal charges. Allen prays in the instant case for reversal of his conviction and dismissal with prejudice of all charges against him, or, alternatively, reversal and remand for a new trial.

Allen claims that due process was denied him because pauper appellate counsel was not appointed for him until March 1992. The elapsed time was forty-four months since he was sentenced and twenty-five months from denial of his *pro se* belated motion to correct errors. He also points out that his appeal was not fully briefed by counsel until July 29, 1994, more than five years from the denial of his *pro se* belated motion to correct errors. Present counsel, of course, completed briefing promptly after being appointed. Allen demands that the time be calculated *in toto* rather than in segments. Therefore, he claims the delay is presumptively unconstitutional, and satisfies the first *Barker* prong. *See Harris*, 15 F.3d at 1560–61 nn. 10–12. We decline to accept Allen's contention.

■ The essence of Allen's claim is that state action denied him a constitutional right. This requires us to examine the actions of State actors, more than merely looking at the calendar. Where the State can demonstrate "good and sufficient cause or special circumstances" for the delay, a presumption of unconstitutional delay may be overcome. *Harris*, 15 F.3d at 1560 (citation omitted). We agree with Allen that the delay in this case exceeds accepted notions of reasonableness, but this only entitles Allen to a presumption that can be rebutted. There are some circumstances that, though not jus-

---

**23.** Nor is appellate delay beyond the scrutiny of the Indiana Constitution. Our Bill of Rights states:

> All courts shall be open; and every person for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily and without delay.

Ind. Const. art. I, § 12. Allen cites this provision at the outset of his argument, but fails to breathe life into his argument by grounding it adequately and independently on State law. It is therefor waived. *St. John v. State*, 523 N.E.2d 1353 (Ind. 1988).

tifying delay, explain much of it.[24] What is not explicable, and leads us to find the delay in adjudicating this appeal unreasonable, is the two-year delay in the appointment of pauper counsel. The trial court's lack of diligence tips the first *Barker* factor in Allen's favor.

▪ Second, Allen maintains that he was not responsible for the delay in processing his appeal. This is not entirely true because Allen's act of filing a *pro se* motion to correct errors caused an irretrievable break-down in the attorney-client relationship and put counsel's continued representation into a conflict with Allen's own interest. Allen bears the responsibility for any delay caused by this act, but he is not responsible for the trial court's delay in appointing successor counsel or managing the court reporter. Nor can Allen be assessed the responsibility for appellate counsel Sexson's delay in filing the brief. Thus, we conclude that Allen has caused relatively little of the delay in adjudicating this appeal.

▪ Allen asserts he meets *Barker*'s third prong because he consistently pressed his cause, which invoked his right to a prompt resolution of his appeal. This argument is not convincing, especially in light of his reliance on *Harris*.[25] Allen has filed the same papers as any other appellant. He has not filed any documents indicating a desire to speed the process. Accordingly, *Barker*'s third factor does not weigh in Allen's favor.

Prejudice to the claimant is the most important prong of the *Barker* test. Allen claims that delay has prejudiced him in two ways: he suffers constitutionally cognizable anxiety and he cannot receive a fundamentally fair review of his conviction and sentence in this direct appeal.[26]

"Constitutionally cognizable anxiety" is a nebulous notion. In *Harris v. Champion,* the Tenth Circuit attempted to flesh out the concept. That court noted:

> [T]hat a petitioner is anxious about the outcome of the appeal from the day the notice of appeal is filed is of no consequence; the anxiety must relate to the period of time that the appeal was excessively delayed.

*Harris,* 15 F.3d at 1564. The court enunciated a rule requiring the claimant to make a particularized and substantial showing of anxiety and concern owing to the delay, except in cases of delay so egregious as to trigger the presumptive prejudice found in *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).[27]

▪ Allen claims that he has suffered "constitutionally cognizable anxiety" in this way:

> It is difficult to imagine anything more anxiety-producing and more inhumane, than the daily and agonizing specter of your own execution at the hands of a system which has repeatedly violated your most precious constitutional rights.

(Appellant's Br. at 51.) This hyperbole fails to specify any particular and substantial anxiety resulting from the *delay;* all death sen-

---

24. When it became apparent that this case was not proceeding properly, this Court intervened and established schedules for transmission of the record and briefing. When the schedule was not kept, this Court found the court reporter in contempt. *In re Hatfield,* 607 N.E.2d 384 (Ind. 1993). When the Marion County Public Defender Board intervened on Allen's behalf because pauper counsel's appellate brief was woefully inadequate, this Court struck the brief and appointed new appellate counsel. From that point, this case has proceeded at a normal pace.

25. In *Harris* the defendants awaiting resolution of their appeals filed habeas corpus petitions in the federal courts demanding relief. Only after the state failed to respond in a meaningful manner did the District Court order *conditional relief.* 15 F.3d at 1566–67.

26. We note that Allen is already serving an eighty-eight year sentence on another conviction, so the delay has not caused him to suffer oppressive incarceration.

27. In *Doggett,* the Supreme Court granted petitioner relief under the Sixth Amendment's Speedy Trial Clause where governmental negligence caused a delay in *prosecution* six times longer than that generally sufficient to trigger *Barker* review, 505 U.S. 647, 658, 112 S.Ct. 2686, 2694, 120 L.Ed.2d 520, *and* the petitioner's generalized claim of prejudice was neither diminished by his conduct nor persuasively rebutted by the government. *Id.*

tences are "anxiety-producing." Allen does not demonstrate that he suffers "constitutionally cognizable" anxiety.

Allen also claims the time his case has taken prevents a fair review in this Court. Allen does not show, however, how his ability to present this appeal has been prejudiced by the passage of time. To the contrary, this Court removed ineffective appellate counsel, appointed replacement counsel, and protected him against procedural default. Furthermore, as Indiana's death penalty jurisprudence has developed, the passage of time has strengthened some of Allen's claims. *See* discussion *infra*, Part IV(E). Allen's appellate rights have not been prejudiced.

Allen offers two arguments about delay and possible prejudice in case of a retrial. First, he says the passage of time will dim the memories of the police officers who interrogated him. This argument is meritless because we hold that the interrogation is not a constitutional violation. As to Allen's second contention, prejudice due to the death of a material witness,[28] Allen fails to show how the witness' testimony is material or why it could not be presented by other witnesses. In any event, we see no present reason for a new trial.

Balancing the four *Barker* factors, we conclude Allen has not been denied due process by the length of time his appeal has taken. Although the delay is presumptively prejudicial and Allen is not responsible for most of it, he has neither demanded expedited review nor proven actual prejudice. This last consideration, actual prejudice, weighs most heavily against him.

### C. The Death Penalty and the Mentally Retarded

Allen maintains that his death sentence must be reversed because he is mentally retarded. Indiana now immunizes mentally retarded criminals from the death penalty. Ind.Code Ann. § 35–36–9–1 to –7 (West Supp.1996).[29] As a result, Allen claims he may only be sentenced to a term of years. Allen recognizes that for this Court to so hold, we would have to apply the mental retardation exemption retroactively because he was sentenced nearly six years before its enactment.

Allen urges four arguments in support of his position. He first argues that Section 35–36–9 alters death sentence eligibility for a class of offenders due to a personal characteristic that is "not controllable or manipulable." He asserts that refusal to extend the statute to him would violate due process and equal protection, and constitute vindictive justice and cruel and unusual punishment. Allen does not offer much on retroactivity to support this contention, but instead attempts to bootstrap his "evolving standards of decency" argument onto due process and equal protection analyses. This argument is not a substitute for contentions recognized in the jurisprudence of these two clauses. Moreover, the principal case on vindictive justice cited by Allen, *Vicory v. State*, 272 Ind. 683, 400 N.E.2d 1380 (1980), is largely contrary to his position.

Second, he asserts that new evidence shows him to be retarded, and that he would be the first and last mentally retarded person executed in Indiana.[30] This claim is unfounded; the trial court has not found that Allen is retarded. *See infra*, Part IV(F).

Third, Allen demands retroactive application of mental retardation death penalty immunity based on *Daniels v. State*, 561 N.E.2d 487 (Ind.1990). He contends that he may receive the new statute's benefit notwithstanding *Daniels* because his conviction and sentence are not yet final. *Daniels*, like *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), dealt not with a

---

**28.** The allegedly material witness was his older sister, Gwendolyn. Allen states that she would testify about his mental frailties and his family's dynamics to which his mother and other siblings are available to testify.

**29.** Act of March 15, 1994, Pub.L. 158–1994, Sec. 3, 1194 Ind. Acts 1851.

**30.** This claim rests on our decision in *Cooper v. State*, 540 N.E.2d 1216 (Ind.1989). Cooper would have been the only person executed for a crime committed at age fifteen. How many death row inmates in Indiana's history might have been retarded is likely unknowable.

statutory privilege, right, or immunity, but with changes in constitutional law. Absent a constitutional mandate for the rule exempting mentally retarded individuals, this Court is neither expected nor required to engage in retroactivity analysis. Rather, the extent of our writ is to enforce the law as it was at the time Allen committed his crimes. *Watford v. State*, 270 Ind. 262, 384 N.E.2d 1030 (1979).

■ Allen's fourth and last argument is that to execute him in the face of his mental frailties would offend evolving standards of decency, thereby rendering the punishment vindictive, cruel, and unusual. The idea that the legislature decided to exempt mentally retarded criminals from the death penalty as a statement of society's regard for the moral culpability of such individuals is legitimate. However, the General Assembly specifically legislated and the Governor signed into law a statute of repose for claims of mental retardation in capital cases tried before July 1, 1994, rather than amending the Constitution or leaving the act open-ended for judicial interpretation. Pub.L. 158–1994, Sec. 8, 1994 Ind. Acts 1857. Ernestine Griffin was murdered in 1987 and Allen was tried in 1988. Per the specific mandate of repose found in section eight of Public Law 158, the trial court's judgment is not affected by the statute exempting mentally retarded persons from the death penalty.

### D. Victim Impact Evidence

Allen claims that he was denied due process by the admission of victim impact evidence. He maintains that Griffin's daughter's testimony that Griffin was a religious woman who neither swore nor drank alcohol, enjoyed baking, regularly attended church, read the Bible, hosted Sunday school parties, and lived in the same house for more than twenty years was offered for purpose of arousing jury's sympathy for her, prejudicing Allen. He claims admission of this evidence violates Indiana law because death penalty cases are exempted from the statutory mandate requiring a trial court to consider a victim impact statement prior to sentencing. Ind.Code Ann. § 35–38–1–8.5, –9 (West Supp.1996). Allen adds that consideration of victim impact evidence violates both the con-stitutional requirement of proportionate sentencing and the prohibition against vindictive justice, Ind. Const. art I, §§ 16, 18. He claims it diverts the jury and trial court's attention from the defendant and his crime.

The State responds with alternative arguments. First, the State argues that the prosecutor intended only to show the victim's propensities not to use violence and not to use certain racially derogatory slurs and curse words. Second, the State insists that even if this evidence was improperly admitted under *Bivins v. State*, 642 N.E.2d 928 (Ind.1994) (victim impact evidence inadmissible in capital cases), the admission was harmless.

■ We agree with both the State's contentions. Evidence of Griffin's character was relevant to rebut Allen's version of the facts: that while Allen was in Griffin's home she cursed and insulted him and then attacked him with a knife, causing him to strike back at her. Even though this guilt-phase evidence may have been unnecessarily drawn out in rebuttal, the prosecutor did not expressly rely on it in his argument to the jury. Accordingly, Allen cannot demonstrate prejudice because the jury's attention was not diverted from the defendant to the victim nor was there an appeal to the jurors' sense of vengeance.

Moreover, any prejudice was attenuated in both time and manner of use. The allegedly prejudicial evidence was admitted during the guilt phase, not the penalty phase or sentencing hearing, and therefore is separated from sentencing by a significant gap in time.

Tension always inheres in the admission of evidence of a murder victim's character when the guilt-phase evidence is stipulated into the penalty-phase. The critical issue in measuring prejudice to the defendant is the manner in which the state employs the evidence. Death penalty trials employ a bifurcated procedure designed to provide the defendant with a just, fair legal process that ensures a death sentence is unique and particular to the defendant and the crime. Naturally, different evidentiary relevancy concerns are in play because different legal issues are being

resolved in a capital trial's various procedural stages.

The penalty phase differs from the guilt-phase in some significant ways. It is a sequential, two-pronged inquiry, the first of which is a factual determination of proof beyond a reasonable doubt of the charged statutory aggravator. This is clearly distinguishable from requiring the jury to test the evidence for proof beyond a reasonable doubt of all the elements of a crime because it is a very specific inquiry into the nature of a murder. The second inquiry in the penalty-phase requires balancing of aggravators and mitigators, and it is undertaken only once the jury has found the charged statutory aggravator proven beyond a reasonable doubt.

We are satisfied that the error, if any, was harmless. *Bivins,* 642 N.E.2d at 957.

### E. Non–Statutory Aggravators

Allen claims that the trial court committed constitutional and statutory error by relying on invalid aggravating factors when sentencing him to death. This claim is the one that is most adversely affected by the passage of time in the adjudication of this appeal, because a number of cases refining capital sentencing procedures have been decided in the interim. Directly on point, this Court has decided *Bellmore v. State,* 602 N.E.2d 111 (Ind.1992), and *Bivins v. State,* 642 N.E.2d 928 (Ind.1994).

*Bellmore* held that the open-ended authorization for general felony aggravators, Ind. Code Section 35–38–1–7.1(d), would be impermissible in capital sentence proceedings as unconstitutionally vague. *Bellmore,* 602 N.E.2d at 129. It also held that an aggravating factor not among those listed in the death penalty statute cannot be considered as "the *determinative* factor" when sentencing a defendant to death. *Id.* (emphasis in original). Relying on the Indiana Constitution's requirement that a death sentence be proportionate to the nature of the offense and the character of the offender, Ind. Const. art I, § 16, we held in *Bivins* that a trial court may consider only those aggravating circumstances specified in the death penalty statute, Indiana Code Section 35–50–2–9(b). *Bivins,* 642 N.E.2d at 955.

Sentenced in 1988, Allen's death sentence predated the announcement of these rules. In the court's oral pronouncement of the sentence, it first considered the charged aggravating factor, and one uncharged aggravating factor, and the mitigating factors listed in the death penalty statute. It then considered the general felony enhancement statute, Ind.Code Section 35–38–1–7,[31] and then weighed the aggravators and mitigators. The court merged the murder and felony murder counts and sentenced Allen to death, then sentenced him to the maximum penalty of fifty years for his conviction of robbery as a class A felony. The court's consideration of the general felony sentencing statute undoubtedly was proper for the purpose of sentencing Allen on the robbery conviction. We will, however, apply *Bellmore* and *Bivins* to Allen's penalty of death.

### F. Remand for Written Sentencing Order

On July 3, 1996, we remanded Allen's case *sua sponte* to the trial court for production of a written sentencing order, which was lacking in the transcript of proceedings. Unlike other cases in which we faced the deficiency of not having a written order to review, our remand order was not merely a request for a *nunc pro tunc* entry, *e.g., Schiro v. State,* 451 N.E.2d 1047 (Ind.1983), or a writ of certiorari, *e.g., Benirschke v. State,* 577 N.E.2d 576 (Ind.1991). Instead, we ordered the trial court to produce a new sentencing order that complied with the procedures explained in *Roark v. State,* 644 N.E.2d 565 (Ind.1994), and the precedents established in *Bellmore* and *Bivins.* Furthermore, we noted that Allen submitted affidavits with a belated motion to correct errors, which had been denied, and directed the trial court to consider the sworn statements under a Trial Rule 59 standard when issuing the sentencing order.[32]

---

**31.** Amended in 1989, this Section is now Ind. Code § 35–38–1–7.1.

**32.** The substantive portion of the order is as follows:

In consideration of this appeal, it has become apparent that the record of proceedings in this case does not contain a written sentencing order, which is a violation of Indiana's death penalty sentencing procedure. *See*

Without vacating the sentence, we effectively instructed the trial court to reconsider Allen's sentence under narrower, stricter standards mandated by our later interpretations of the law.

On July 30, 1996, the trial court certified its order to us. We permitted additional briefs, and the parties submitted them. Allen presents one issue following the remand: whether the trial court's sentencing statement imposing a sentence of death is valid under statutory and constitutional standards. He advances two arguments to support his request for appellate reweighing and sentence reduction to a term of years or vacatur of the sentence and remand for a new penalty phase hearing before a different trial judge: (1) that the sentencing statement is not sufficiently specific to ensure that the trial court complied with the law, and (2) that the trial court did not comply with either statutory or constitutional procedures.

■ The sentencing order's first sentence states: "The Court finds that the State has proved beyond a reasonable doubt that the aggravating circumstance of intentionally killing the victim while committing a robbery exists." (Supp. R. at 79.) This finding is supported by the record, and thus passes muster.

Allen's second argument, that the court's "sentencing statement is insufficient because it fails to demonstrate statutory or constitutional compliance," has five subcontentions: (1) the trial judge failed to make "separate and independent judgments" with respect to the aggravator, its weight, or the balance between aggravator and mitigators; (2) the sentencing statement does not provide any assurance that the judge did not consider improper matters; (3) the court did not conduct discrete and individualized consideration of Allen's character; (4) the evidence relied on by the court is not credible; and (5) the sentencing statement fails to indicate that the death sentence was the personal conclusion of the judge. These arguments can be pared down to whether the trial judge properly considered and weighed the evidence, whether he considered invalid aggravators, and whether the judge reached an independent conclusion that a sentence of death is warranted.

■ Oddly, counsel claims that the order is "complete(ly) silent" regarding the evidence of mental retardation. Judge Barney devoted more than half of his four-page order to weighing the evidence averred by Mary Jo Dare and Dr. Richard Dever, experts who submitted affidavits supporting Al-

Brewer v. State, 275 Ind. 338, 357, 417 N.E.2d 889, 899 (1981); Judy v. State, 275 Ind. 145, 167, 416 N.E.2d 95, 108 (1980). To correct this error, the Court ORDERS this cause remanded to the trial court for the entry of a written sentencing order for Allen's conviction on Count II, felony murder, pursuant to Ind. Code § 35–50–2–9.

In rendering this order, this Court notes that the trial court's substantial, detailed oral pronouncement of sentence was properly based on the state of death penalty jurisprudence at that time. (R. at 3182–88.) Since then, however, this Court has refined a trial court's duty to balance the aggravating circumstances (charged pursuant to the death penalty statute, Ind.Code Section 35–50–2–9, and proven beyond a reasonable doubt) against the evidence of mitigating circumstances (including both statutory and non-statutory circumstances). Accordingly, the Court FURTHER ORDERS the trial court to issue its written sentencing order according to the procedures explained in Roark v. State, 644 N.E.2d 565, 570 (Ind.1994), and in view of the precedents established in Bellmore v. State, 602 N.E.2d 111 (Ind.1992), and Bivins v. State, 642 N.E.2d 928 (Ind.1994).

Finally, Allen's counsel strenuously argues in mitigation that he is mentally retarded, but the trial court's oral pronouncement of sentence does not mention mental retardation. This Court takes notice of the fact that there is evidence in the record of proceedings that the defendant is of average mentality. Allen sought leave of this Court to file a Belated Motion to Correct Errors for the purpose of challenging this evidence. That petition was denied because this Court permitted Allen to raise in his appeal any and all issues he would aver in the Belated Motion to Correct Errors. The Court notes, however, that Allen attached to his petition affidavits tending to show his mental capacity. These documents have never been tendered in the trial court nor weighed in mitigation. We hereby DIRECT the trial court to consider Allen's affidavits utilizing the standards of Trial Rule 59. The trial court is empowered with the discretion to make such findings or enter such orders as a proceeding under Rule 59 ordinarily contemplates. (Order of July 3, 1996.)

len's claim of retardation. He found it controverted by other evidence in the record, which reduces the issue to one of credibility. The trial court's judgment about the credibility and weight of evidence is part and parcel of its statutory balancing function. This Court will not second-guess the trial court on questions of credibility or weighing. *Benirschke*, 577 N.E.2d at 582.

▪ Second, Allen claims the sentencing statement does not provide any assurance that the judge did not consider improper matters as aggravating factors. Specifically, he claims that the written order does not erase the errors committed in the oral pronouncement of sentence made by the judge in 1988. We disagree.

Our remand order specifically directed the trial court to take three actions that operated to Allen's benefit when issuing the written sentencing order. The first was our command that the trial court follow current capital sentencing standards, which are stricter and narrower than those of 1988. The second was our directive that the court consider evidence favorable to the defendant that was outside the trial record. Finally, we granted the full scope of Trial Rule 59 powers to the court, explicitly empowering it to grant relief such as that contemplated in subsection (J).[33] Essentially, the trial court was invited to reconsider its sentencing determination in light of new evidence and a more limited weighing standard, with more specific requirements for explaining its determination of the balance. We consider this a fair process, one which advanced Allen's interests.

We ordered these safeguards to assure that impermissible non-statutory aggravators were not factors weighing in the capital sentencing balance. The trial court performed its duty under the remand order in a straightforward way. Allen suggests nothing demonstrating otherwise.

Allen complains that there is a "deafening silence" from the trial court with respect to its finding that the charged aggravating factor outweighs "the possibility of the mitigating circumstance of mental retardation." This is not true. Judge Barney devoted more than fifty percent of his written order to determining the weight to ascribe to the mental retardation evidence averred. He accomplished this by comparing it to evidence

---

**33.** Trial Rule 59(J) states:

(J) Relief Granted on Motion to Correct Error. The court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the errors:

(1) Grant a new trial;

(2) Enter final judgment;

(3) Alter, amend, modify or correct judgment;

(4) Amend or correct the findings or judgment as provided in Rule 52(B);

(5) In the case of excessive or inadequate damages, enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or grant a new trial subject to additur or remittitur;

(6) Grant any other appropriate relief, or make relief subject to condition; or

(7) In reviewing the evidence, the court shall grant a new trial if it determines that the verdict of a non-advisory jury is against the weight of the evidence; and shall enter judgment, subject to the provisions herein, if the court determines that the verdict of a non-advisory jury is clearly erroneous as contrary to or not supported by the evidence, or if the court determines that the findings and judgment upon issues tried without a jury or with an advisory jury are against the weight of the evidence.

In its order correcting error the court shall direct final judgment to be entered or shall correct the error without a new trial unless such relief is shown to be impracticable or unfair to any of the parties or is otherwise improper; and if a new trial is required it shall be limited only to those parties and issues affected by the error unless such relief is shown to be impracticable or unfair. If corrective relief is granted, the court shall specify the general reasons therefor. When a new trial is granted because the verdict, findings or judgment do not accord with the evidence, the court shall make special findings of fact upon each material issue or element of the claim or defense upon which a new trial is granted. Such finding shall indicate whether the decision is against the weight of the evidence or whether it is clearly erroneous as contrary to or not supported by the evidence; if the decision is found to be against the weight of the evidence, the findings shall relate the supporting and opposing evidence to each issue upon which a new trial is granted; if the decision is found to be clearly erroneous as contrary to or not supported by the evidence, the findings shall show why judgment was not entered upon the evidence.

already contained in the record: that Allen's criminal history showed him to be a "solo-acting criminal;" that earlier presentence reports showed Allen with an I.Q. of 104; [34] that in open court his own counsel withdrew a prior motion for psychiatric evaluation; that none of his family members who testified on his behalf described him as anything other than of normal intelligence; [35] that none of the eighteen people who submitted letters on Allen's behalf to the court hinted that he was not of normal intelligence; and that the judge's own observation of the defendant showed that he understood the proceedings. Accepting the facts alleged about Allen's childhood does not compel a finding of mitigating circumstances. *Lowery v. State,* 547 N.E.2d 1046 (Ind.1989), *cert. denied* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). Comparison is what a person does when balancing, and the trial judge indeed weighed the evidence when deciding to impose a sentence of death.

Moreover, the trial court certified on remand that it considered only one aggravating factor: the defendant's act of intentionally killing the victim while committing a robbery. It then considered statutory mitigating factors and the defendant's affidavits tending to describe him as retarded. The trial judge found the evidence relevant to mitigating factors to be of little weight. Accordingly, he found the charged aggravator outweighed the mitigating factors, considered the jury recommendation that the defendant should be sentenced to death, and pronounced a sentence of death. This is what the death penalty statute requires. Ind.Code Ann. § 35–50–2–9 (West Supp.1996); *Roark v. State,* 644 N.E.2d 565 (Ind.1994).

■ Allen's claims that the sentencing statement fails to indicate that the death sentence was the personal conclusion of the judge and that the court did not conduct discrete and individualized consideration of Allen's character are meritless. The written order refers to information contained in presentence reports and personal letters that only the trial judge would have seen, not the jury, and the order specifically refers to "the Court's own observation of the Defendant." (Supp. R. at 81.) The court's balancing of the evidence emphatically displays its discrete, individualized sentencing.

The trial court weighed only one statutory aggravator, which it expressly found was proven beyond a reasonable doubt. It considered Allen's mental retardation evidence and found it to be of little weight. It weighed the evidence of mitigating factors against the aggravating factor, it considered the jury's recommendation, and then it concluded that death was the appropriate sentence. Accordingly, the trial court's order demonstrates satisfactorily that the court complied with statutory and constitutional law when sentencing Allen.

### Conclusion

The arguments made in this appeal do not demonstrate that Howard Allen was sentenced to death in a tainted, unconstitutional proceeding. The fact that the arguments made by Allen's counsel did not convince the jury not to recommend the death penalty or the judge not to impose it does not prove that counsel was ineffective or that Allen did not receive a fair hearing. The evidence that Ernestine Griffin was intentionally killed and that Howard Allen is her killer overwhelms. There is little evidence that Allen is mentally retarded, and none that shows him to be incapable of appreciating the criminality of his conduct or to conform it to the law. At sentencing, Allen's colloquy with the trial judge amply demonstrated that he was mentally present and that he understood the proceedings. As a result, the trial court's balance of the statutory aggravator against the scant evidence in mitigation and the court's due consideration of the jury's recom-

**34.** Allen hotly contests this finding, claiming that the test, the Beta I.Q., is not an accurate measure. Whatever the truth may be concerning the verity of this claim, the fact remains that the record contains evidence of an I.Q. test that was widely employed by the State for the assessment of its incarcerated individuals and this test showed this defendant to have a normal I.Q.

**35.** In fact, Allen's mother testified that he was an "average" student, (R. at 3119), and that he would teach the "kids in the neighborhood ... karate and tell them what the options was to going to prison and stuff like that...." (R. at 3121.)

mendation are reasonable in fact and supportable in law. We conclude that the aggravating circumstance outweighs the mitigating circumstance and that the penalty is appropriate to the offense and the offender.

Accordingly, we affirm the trial court.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.